J-S31040-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                     :            PENNSYLVANIA
                                     :
             v.                           :
                                     :
CHRISTOPHER HARTSFIELD          :
                                     :
            Appellant               :     No. 2799 EDA 2023

Appeal from the Judgment of Sentence Entered October 3, 2023
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003149-2022

BEFORE: BOWES, J., McLAUGHLIN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                 **FILED NOVEMBER 26, 2024**

Christopher Hartsfield ("Hartsfield") appeals from the judgment of sentence entered by the Delaware County Court of Common Pleas ("trial court") following his convictions of persons not to possess firearms, firearms not to be carried without a license, resisting arrest, and flight to avoid apprehension.[1] On appeal, Hartsfield challenges the trial court's denial of his motion to suppress a seized firearm and the sufficiency of the evidence to sustain his resisting arrest and flight to avoid apprehension convictions. Upon review, we affirm the order denying the suppression motion and his judgment of sentence as to the resisting arrest conviction but vacate his judgment of sentence as to the flight to avoid apprehension conviction.

---

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 5104, 5126(a).

The certified record reflects the following factual and procedural background. On April 15, 2022, at about 9:30 p.m., while on routine patrol, City of Chester Police Officers Geoffrey Walls and Zachary Litvinenko arrived, along with other police officers, in separate marked police vehicles to the area of a store located at 2105 Edgemont Avenue in the City of Chester. N.T., 1/5/2023, at 8-10, 16, 24-25.[2] They had not been called to the area for any complaints, disturbances, or criminal activity. *Id.* at 16, 33-35.[3] As the officers arrived in the area, they observed a group of people on the sidewalk in front of the store, described as "loitering" by Officer Litvinenko, and decided to stop. *Id.* at 28, 32, 34.

The officers saw an individual, later identified as Hartsfield, in front of the store walking "at a normal pace" on the sidewalk towards their police vehicles. *Id.* at 11, 13, 18, 26, 28, 32. As the officers parked their vehicles, with overhead lights and sirens off, Hartsfield was facing Officer Walls about twenty to twenty-five feet away. *Id.* at 12-13, 30, Ex. D-1 (Incident Report, 4/15/2022). When Officer Litvinenko first observed Hartsfield, he was "just

---

[2] As discussed infra, the parties stipulated at trial to the admission of the notes of testimony of the hearing on Hartsfield's motion to suppress. *See* N.T. (Trial), 6/28/2023, Exs. C-1A (Stipulation), C-1B (N.T. (Suppression), 1/5/2023). For ease of reference, we cite directly to the notes of testimony from the suppression hearing.

[3] On the date in question, the City of Chester police had received a call at about 3:00 p.m. reporting seven shots fired in the area. *Id.*, Ex. D-1 (Incident Report, 4/15/2022).

standing there"—he did not see, nor did he have any information, that Hartsfield possessed a weapon or was engaged in any kind of criminal activity. *Id.* at 35-36. While he saw Hartsfield "grab his pants," Officer Litvinenko did not see any object or the silhouette of an object. *Id.* at 37. Officer Litvinenko approached Hartsfield because of "a city ordinance that he was loitering in the area" and based on his experience involving "drug trafficking" and "shootings" in the area, which he described as a "high-crime, high-drug area." *Id.* at 36, 46. Officer Walls likewise did not have any information that Hartsfield was involved in any criminal activity; he did not observe him committing any crime; and he could not see what was on his person or inside his clothing when he first encountered him. *Id.* at 18. Officer Walls did not observe any criminal activity as Hartsfield walked toward his police vehicle. *Id.* at 18, 21. Upon exiting the vehicle, Officer Walls intended to make contact with Hartsfield to ask "what his intentions were being outside" at 9:30 p.m. that night to see if Officer Walls "could develop reasonable suspicion for a further encounter," and whether there was "crime afoot." *Id.* at 19-21. As soon as Officer Walls exited his vehicle, Hartsfield turned in the opposite direction, away from the officer. *Id.* at 13. Officer Walls could not recall if he said anything to Hartfield; he may have said "hey" when he exited his vehicle or may have "yelled stop," but did not tell Hartsfield he was "stopped and not free to go." *Id.* at 14-15.

Based on Hartsfield's behavior of "immediately turning to the opposite direction" upon seeing police and "walking quickly away" from them, Officer Walls "stepped it up a little bit," at which point Hartsfield "took off" by "flee[ing] on foot" with "his hands in his jacket." *Id.* at 13-14, 26, 29. Officer Walls chased Hartsfield on foot while Officer Litvinenko pursued him in a police vehicle. *Id.* at 15, 21, 30. Ultimately, Officer Litvinenko exited his vehicle, pursued Hartsfield on foot, and deployed a taser on him. *Id.* at 15, 30. After Hartsfield dropped to the ground, "there was some resisting" and the police officers could not "get his hands," but eventually handcuffed him. *Id.* at 30. Once handcuffed, Officer Litvinenko frisked him and recovered a .9 mm handgun from Hartsfield's left pocket.[4] *Id.* at 30-32, 38-43, Exs. D-1 (Incident Report, 4/15/2022), D-2 (N.T. (Preliminary Hearing), 7/11/2022, at 8, 21).

Officer Walls described the area as a "well-known hotspot" for "criminal activity, shots fired, homicides, [and] robberies." *Id.* at 8-9. He testified that during his four and one-half-year tenure, he made "numerous" arrests in the area and that the section of sidewalk in front of the store is "very well known" for illegal firearms. *Id.* at 9, 12. Officer Litvinenko testified that he responds to calls in the area during every shift, mostly for "loitering," "groups in the

_____

[4] It is unclear from the record whether Officer Litvinenko found the firearm in the left side of the inner pocket of Hartsfield's jacket or the left side of his sweatshirt. *See id.* at 38-43.

- 4 -

area," "drug trafficking," "fights," and "shots fired." *Id.* at 25, 33-34, 36. In his career, he has made arrests for drug trafficking in the area and responded to about five shootings there. *Id.* at 25, 34.

Based on the foregoing, the Commonwealth charged Hartsfield with the aforementioned crimes, as well as receiving stolen property and person not to possess/use firearms-fugitive.[5] Hartsfield filed a motion to suppress physical evidence and any statements he made to police. The trial court held a suppression hearing on January 5, 2023, at which the Commonwealth presented the testimony of Officers Walls and Litvinenko and a surveillance video; Hartsfield presented the notes of testimony from his preliminary hearing and Officer Litvinenko's incident report. Following the hearing, the trial court directed the parties to file briefs,[6] and on April 10, 2023, the trial court denied the motion to suppress. Hartsfield filed a motion for reconsideration, which the trial court denied. The matter then proceeded to a bench trial on June 28, 2023. The parties stipulated to the admission of all trial evidence: the notes of testimony of the suppression hearing in lieu of the testimony of Officers Walls and Litvinenko at trial; two surveillance videos on

_____

[5] 18 Pa.C.S. §§ 3925(a), 6105(c)(1).

[6] Although the trial court referenced Hartsfield's "memorandum of law" in its findings of fact and conclusions of law denying Hartsfield's suppression motion, no such memorandum (or brief) appears in the certified record. *See* Order Denying Motion to Suppress, 4/10/2023, at 6. The Commonwealth filed a letter brief in opposition on April 6, 2023.

- 5 -

the date at issue; the operability report of the seized firearm in lieu of testimony from the firearms examiner; and that on the date of the incident, Hartsfield was prohibited from possessing a firearm and did not have a permit to possess a concealed firearm.  N.T. (Trial), 6/28/2023, Exs. C-1A, C-1B, C-2A, C-3A, C-3B, C-4A, C-4B, C-6.[7]  The trial court granted counsel's motion for a directed verdict of not guilty of receiving stolen property and person not to possess/use firearms-fugitive.  N.T. (Trial), 6/28/2023, at 9.  The parties presented no argument as to the remaining four charges and the trial court took the stipulated evidence under advisement.  ***See id.***  On June 30, 2023, the trial court rendered its decision and on October 3, 2023, sentenced him to an aggregate term of two and one-half to ten years in prison, with credit for time served.[8]  This appeal followed.

On appeal, Hartsfield raises the following issues for our review:

1.    Whether the trial court erred by denying [Hartsfield's] motion to suppress physical evidence where law enforcement lacked reasonable suspicion to stop [Hartsfield] when he was seized for an investigative detention, in violation of the United States and Pennsylvania Constitutions?

_____

[7] As discussed infra, the parties did not stipulate to Exhibit C-5.

[8] Specifically, the trial court sentenced Hartsfield as follows: count 1 (possession of firearm prohibited): two and one-half to ten years in prison; count 4 (firearms not to be carried without license): two and one-half to seven years in prison, to run concurrently with count 1; count 5 (resisting arrest): two years of probation, to run concurrently with counts 1 and 4; and count 6 (flight to avoid apprehension): two years of probation, to run concurrently with counts 1, 4, and 5.

2.      Whether the evidence was insufficient to establish beyond a reasonable doubt that [Hartsfield] prevented law enforcement from effectuating a lawful arrest, as required to sustain his conviction for 18 Pa.C.S. § 5104?

3.      Whether the evidence was insufficient to establish beyond a reasonable doubt that [Hartsfield] had been charged with a crime at the time of his flight, as required to sustain his conviction for 18 Pa.C.S. § 5126?

Hartsfield's Brief at 5.

In his first issue, Hartsfield challenges the trial court's denial of his motion to suppress.

> On appeal from the denial of a motion to suppress evidence, our review is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is de novo. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Lear*, 290 A.3d 709, 715 (Pa. Super. 2023) (citations omitted).

Hartsfield contends that the police officers lacked reasonable suspicion of criminal activity to justify the seizure of his person. Hartsfield's Brief at 10, 12. He argues that the "collective show of authority" by police as three police vehicles pulled up to Hartsfield and Officer Walls exited his vehicle to approach Hartsfield, along with his order to Hartsfield to stop walking away, constituted a seizure of his person in that a reasonable person would not have believed

- 7 -

he was free to leave. *Id.* at 10, 12, 15. Hartsfield argues that at the time of the seizure of his person (before he began to run away), the officers lacked reasonable suspicion to detain him because they did not observe Hartsfield commit a crime, did not observe any objects bulging from his clothing, and had not received any information that Hartsfield or anyone else may have committed a crime. *Id.* at 10-12, 16-17. While Hartsfield acknowledges that unprovoked flight in a high crime area gives rise to reasonable suspicion for an investigative detention, he argues that the initial seizure occurred before he fled, and at the time he was seized, the officers lacked reasonable suspicion that criminal activity was afoot. *Id.* at 13-17.

> The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty. Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law examines how the interaction is classified and if a detention has occurred.
>
> The focus of search and seizure law remains on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime. In assessing the lawfulness of citizen/police encounters, a central, threshold issue is whether the citizen-subject has been seized.

*Commonwealth v. Rice*, 304 A.3d 1255, 1260 (Pa. Super. 2023) (quotation marks, brackets, ellipsis, and citations omitted).

- 8 -

There are three general categories of warrantless police-citizen interactions:

The first level of interaction is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Id.* (brackets and citations omitted). "During a mere encounter, 'as long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (brackets omitted).

"In evaluating whether an interaction constitutes a mere encounter, we must consider all circumstances evidencing a show of authority or exercise of force[.]" *Id.* A non-exhaustive list of factors relevant to the inquiry include: the number of police officers present during the interaction; the police officer's demeanor, tone of voice, and manner of expression in addressing the citizen; whether the police officer informs the citizen they are suspected of criminal activity; the location and timing of the interaction; the visible presence of weapons on the police officer; and the content of the questions asked or statements made. *Id.* at 1260-61 (citation omitted). "Otherwise inoffensive

contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." *Id.* at 1261 (internal quotation marks and citation omitted).

Unlike a mere encounter, an investigative detention "constitutes a seizure of a person and thus activates the protections of Article I, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot." *Id.* (internal quotation marks and citation omitted).

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a person of reasonable caution in the belief that the action taken was appropriate.

*Id.* (brackets, quotation marks, and citation omitted). In evaluating whether reasonable suspicion existed at the time of the investigative detention, we must examine "the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." *Id.* (citations omitted). "[T]he totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Id.* (internal quotation marks and citation omitted).

Instantly, the trial court found the following facts:

1.    On April 5, 2022, at approximately 10:20 PM, [Hartsfield] was walking towards 21st Street in the direction of Officer [Walls'] vehicle.[9]

2.    As Officer Walls exits his vehicle, [Hartsfield] abruptly turns and begins to walk away, taking approximately 4-5 steps. [Hartsfield] then breaks into a full sprint away from Officer Walls.

3.    Officer [Walls'] police vehicle overhead lights were not flashing at the time [Hartsfield] turned and then ran away.

4.    Officers Walls and Litvinenko gave chase.

5.    [Hartsfield's] hands were in his pockets from the time he turned to walk away, and remained in his pockets, as he sprinted away.

6.    Following a foot pursuit, the officers were able to take [Hartsfield] into custody and recovered a firearm from his pocket during a frisk.

7.    Both Officers Walls and Litvinenko testified to their experience with the location and identified it as a high crime area. (*See* N.T. 01/05/2023 at 8-9, 25, 34, 36).

Findings of Fact and Conclusions of Law, 4/10/2023, ¶¶ 1-7.

The trial court did not analyze whether Hartsfield's initial encounter with police was a mere encounter or investigative detention. In *Rice*, this Court considered such an issue in the Commonwealth's appeal of an order granting

_____

[9] We note that we are unable to find support in the suppression hearing record that the incident occurred on this date and time. The notes of testimony from the suppression hearing indicate that the incident occurred on April 15, 2022, at approximately 9:30 p.m. *See* N.T., 1/5/2023, at 8-10, 16, 25, Ex. D1 (Incident Report, 4/15/2022). This error is non-substantive and our review of the trial court's decision reveals that it did not impact its determination. It therefore does not alter our disposition.

the defendant's suppression motion. *Rice*, 304 A.3d at 1258. There, police officers were on patrol, in uniform, and traveling in a marked car at around 7:25 p.m. in an area the officer testified had heightened gun violence, homicides, and drug sales. *Id.* Police saw the defendant exit a corner store and begin to walk toward the officers. *Id.* They observed an "L" shaped bulge in the defendant's waistband. *Id.* As the officers drove toward him, the defendant quickly turned around and began walking in the opposite direction. *Id.* Police pulled up next to the defendant but did not activate the overhead lights and siren. *Id.* An officer exited the car and began to approach the defendant, the defendant continued to walk away from the officer while looking back in the officer's direction. *Id.* The officer said, "come here," at which the defendant fled. *Id.* One officer pursued him on foot while the other followed in the car. *Id.* The defendant discarded a gun as he fled. *Id.* at 1259. Ultimately, the officers arrested the defendant, charging him with firearms violations. *Id.* at 1258-59.

The court below granted the defendant's motion to suppress; on appeal, this Court reversed. *Id.* at 1258, 1263. Relying on *Commonwealth v. Newsome*, 170 A.3d 1151 (Pa. Super. 2017), we held that under the circumstances, the "officer's mere statement to 'come here,' without more, did not escalate the mere encounter to an investigative detention" and that "the suppression court erred in concluding that the officers' pre-flight interaction with [the defendant] constituted an investigative detention." *Id.*

at 1262. Specifically, this Court noted that the police "officers did not engage their vehicle's sirens or lights, brandish their weapons, position themselves in a manner that hindered [the defendant's] liberty to continue walking, tell [him] that he was not free to leave, or threaten consequences for non-compliance. *Id.* at 1262. Consequently, this Court determined that police had reasonable suspicion to pursue the defendant following his unprovoked flight in a high crime area and the recovery of the firearm abandoned by the defendant during his flight was lawful. *Id.* at 1263.

In *Newsome*, this Court reversed a court's grant of the defendant's motion to suppress, holding that a police lieutenant's initial interaction with the defendant was a mere encounter because his request for the defendant to "come here" so he could talk to him was not a substantial impairment on the defendant's liberty of movement. *Newsome*, 170 A.3d at 1152, 1156. The lieutenant had responded to an anonymous radio call that a group of people was passing around a gun in an area known for shootings. *Id.* The lieutenant arrived at the scene in full uniform and a marked police vehicle without the lights or sirens engaged. *Id.* at 1152, 1156. He approached the defendant to investigate the radio call and because he believed the defendant to be in violation of the city's curfew. *Id.* at 1155-56. The lieutenant asked the defendant "to come here" so he could talk to him, but the defendant refused and continued walking down the street. *Id.* at 1153, 1155. Once the defendant was about eight to ten feet away, the lieutenant saw the defendant

discard what looked like a gun in a nearby flowerpot. *Id.* at 1153. Another police officer recovered a firearm from the flowerpot and the defendant was subsequently arrested and charged with firearms violations. *Id.* The lieutenant had not brandished his weapon, engaged in an overwhelming show of force, or told the defendant he was not free to leave, nor had the lieutenant positioned himself to obstruct the defendant's ability to continue walking down the street. *Id.* at 1156. The lieutenant asked the defendant "to stop" two or three times, but there was no evidence that he threatened any consequences for non-compliance or used an authoritative tone. *Id.* at 1156. This Court thus concluded, based on the totality of the circumstances, that the defendant was not seized during his initial encounter with the lieutenant. *Id.*

Similarly, in **Commonwealth v. Thomas**, 273 A.3d 1190, 1200 (Pa. Super. 2022), this Court affirmed the denial of the defendant's motion to suppress where the totality of the circumstances showed the initial interaction between police officers and the defendant was a mere encounter. Police observed the defendant riding his bicycle on a sidewalk in violation of a city ordinance. *Id.* The officers pulled up next to him and asked, "Yo, can you hold up a second?" *Id.* The defendant stopped and got off his bicycle as an officer exited the vehicle. *Id.* Without provocation, the defendant immediately fled on foot, discarding a firearm from his waistband during flight. *Id.* at 1201. Because the officers did not demand compliance, threaten any consequences for non-compliance, activate their lights and sirens, brandish a

weapon, engage in an overwhelming show of force, use a commanding tone of voice, inform the defendant he could not leave, or obstruct his ability to leave, this Court agreed that the initial interaction did not escalate beyond a mere encounter and therefore, the trial court's denial of the suppression motion was proper. *Id.* at 1202.

Returning our attention to the instant matter, the suppression record demonstrates that the initial interaction involved multiple police officers in marked vehicles pulling up along a sidewalk without lights or sirens activated. *See* N.T., 1/5/2023, at 12, Exs. D-1 (Incident Report, 4/15/2022), D-2 (N.T. (Preliminary Hearing), 7/11/2022, at 17). There is no indication in the suppression record that Hartsfield's initial encounter with the officers involved weapons drawn, intimidating movement, a show of force, obstruction of his path of travel, physical restraint, a statement that Hartsfield was not free to leave, a mandate to comply, or threatened consequences for non-compliance. Officer Walls was not even sure that he said anything to Hartsfield as he exited the police vehicle, and the suppression court made no affirmative finding in this regard. *See id.* at 14-15 (Officer Walls testifying that may have said "hey" or "yelled stop" when he exited his vehicle). Accordingly, we conclude that the totality of the circumstances reflected in the suppression hearing record supports a finding that the initial interaction between the police officers and Hartsfield was a mere encounter not requiring any level of suspicion. *See*

*Rice*, 304 A.3d at 1258; *Newsome*, 170 A.3d at 1152, 1156; *Thomas*, 273

A.3d at 1202.

We next examine whether, and if so, when, the mere encounter between

police and Hartsfield developed into an investigatory detention supported by

reasonable suspicion. The trial court analyzed Hartsfield's claim as follows:

> Here, it is clear from the officers' testimony and the surveillance video ([N.T., 1/5/2023, Ex.] C-1) that Hartsfield fled from police without being provoked. Hartsfield turned away at the sight of Officer Walls exiting his vehicle and quickly began running away. At the moment that Hartsfield begins to flee, there are no police lights activated, merely an officer exiting his vehicle.
>
> The controlling cases have repeatedly held that where, as here, a person flees from the police in a high-crime area, reasonable suspicion exists such that a stop of the person is constitutionally justified. *See Illinois v. Wardlow*, 528 U.S. 119 (2000) (police had reasonable suspicion to stop the respondent for investigation where he fled from them in a high-drug area); *In re D. M.*, 781 A.2d 1161, 1164 (Pa. 2001) ("unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry*[10] stop"); *Commonwealth v. Dunham*, 203 A.3d 272, 278 (Pa. Super. 2019) ("unprovoked flight from police in a high-crime area is sufficient to create reasonable suspicion for police pursuit and will not warrant suppression")[.]
>
> Although [Hartsfield's] flight from the police in a high-crime area was itself sufficient to justify an investigatory stop, there were additional factors that supported the stop. Hartsfield's hands were in his pockets from the time he turned to walk away, and they remained in his pockets, even as he was sprinting away from the officers. This action led the officers to believe he was carrying a gun. As Officer Litv[i]nenko explained, "…numerous times that people see police, when they observe us, and they touch the area where they have things." N.T.[,] 01/05/2023[, at] 36. Based upon this experience, the officer's conclusion that the defendant

_____

[10] *Terry v. Ohio*, 392 U.S. 1 (1968).

> was carrying a gun was entirely reasonable. **See Commonwealth v. Foglia**, 979 A.2d 357, 361 (Pa. Super. 2009) (en banc) (the appellant's grabbing at his waistband found to be particularly relevant to the reasonable suspicion analysis because "[t]he police officer was aware, based upon his experience with armed suspects, that weapons are often concealed in a person's waistband"); **see also Commonwealth v. Dix**, 207 A.3d 383, 389 (Pa. Super. 2019) (police reasonably believed the large item the appellant placed in his waistband was a firearm)[.]

Findings of Fact and Conclusions of Law, 4/10/2023, at 4-6 (some citations omitted; ellipsis in original; footnotes added). The trial court also distinguished the case relied upon by Hartsfield, **Crews v. City of Chester**, 35 A.3d 1267 (Pa. Cmwlth. 2012), because it was a civil case that found the City of Chester's loitering ordinance unconstitutionally vague but further observed that the **Crews** decision acknowledged, in dicta, that unprovoked flight in a high crime area gives rise to reasonable suspicion to conduct an investigatory **Terry** stop. **Id.** at 6-7.

The suppression court correctly recognized that our Supreme Court has held that "unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a[n investigative] **Terry** stop under the Fourth Amendment." **In re D.M.**, 781 at 1164. As this Court has explained,

> [t]he United States Supreme Court held that although mere presence in a high crime area is insufficient to support a **Terry** stop, the additional factor of unprovoked flight was indeed relevant. The [High] Court ultimately concluded that the two factors in combination were sufficient to satisfy the **Terry** standard of reasonable suspicion. [**Wardlow**, 528 U.S.] at 124.

**Commonwealth v. Barnes**, 296 A.3d 52, 58 (Pa. Super. 2023) (quoting **Commonwealth v. Jefferson**, 853 A.2d 404, 406 (Pa. Super. 2004)). This

- 17 -

holding has been extended to challenges made under the Pennsylvania Constitution. **Jefferson**, 853 A.2d at 406-07.[11]

The trial court's findings of fact, and in particular, its findings that Hartsfield's flight from the police officers was unprovoked and occurred in a high crime area, are supported by the record. **See** Findings of Fact and

---

[11] As Hartsfield correctly observes in his brief, reliance on the "high crime area" factor in our Commonwealth's search and seizure jurisprudence has been criticized by several Justices of our Supreme Court. **See** Hartsfield's Brief at 14-15 n.12. Several decisions of our High Court that did not garner majority support have called for its elimination because it violates both the federal and state constitutions in contravention of the requirement of individualized reasonable suspicion or probable cause; have found it creates inequity in the privacy protection afforded to individuals based on their location; have criticized its use because there is no objective standard or evidence required to be presented to support law enforcement's determination that an area is "high crime." **See, e.g., Commonwealth v. Dobson**, 307 A.3d 612, 624-26 (Pa. 2024) (Wecht, J., Opinion in Support of Reversal); **Commonwealth v. Jackson**, 302 A.3d 737, 756-62 (Pa. 2023) (Donohue, J., Opinion in Support of Reversal); **Commonwealth v. Galloway**, 284 A.3d 870, 875 (Pa. 2022) (Wecht, J., dissenting); **Commonwealth v. Thompson**, 985 A.2d 928, 943-44 (Pa. 2009) (Baer, J., concurring).

In fact, our Supreme Court has granted allowance of appeal on this issue: "Because flight alone by an individual at the sight of police does not provide the necessary reasonable suspicion of criminal activity for a stop, does it violate Article I, Section 8 to hold that there is reasonable suspicion based solely on the location of the flight in a "high crime area," a factor that involves no additional conduct by the person police pursue and stop?" **Commonwealth v. Shivers**, ___ A.3d ___, 2024 WL 3370506 (Pa. filed July 11, 2024) (per curiam). This matter remains pending before our Supreme Court at the time of this writing and has not yet been decided; we are therefore required to follow the decisional law established by this Court. **Commonwealth v. Santiago**, 980 A.2d 659, 666 n.6 (Pa. Super. 2009) (noting that this Court's decisional law is viable precedent unless "overturned by an en banc panel of this Court, or by a decision of the Pennsylvania Supreme Court").

Conclusions of Law, 4/10/2023, ¶¶ 2, 5, 7; N.T., 1/5/2023, at 8-9, 12-15, 21, 25-26, 29-30, 33-34, 36, 46, Ex. D-1 (Incident Report, 4/15/2022). Thus, based upon the current state of the law, we agree with the court's legal conclusion that the police officers had reasonable suspicion to pursue Hartsfield following his unprovoked flight. *See Barnes*, 296 A.3d at 58 (holding the defendant's presence in a high crime area coupled with unprovoked flight from a police officer was sufficient to establish reasonable suspicion to justify an investigative detention of the defendant). Consequently, Officer Litvinenko's recovery of the firearm during the investigative detention was lawful and we affirm the trial court's denial of Hartsfield's suppression motion.

In his second and third issues, Hartsfield challenges the sufficiency of the evidence to sustain his convictions of resisting arrest and flight to avoid apprehension. Our standard of review for a challenge to the sufficiency of the evidence is well settled:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

*Commonwealth v. Juray*, 275 A.3d 1037, 1042 (Pa. Super. 2022) (quotation marks and citations omitted). The factfinder "is free to believe all,

part, or none of the evidence presented." ***Commonwealth v. Williams***, 302 A.3d 117, 120 (Pa. Super. 2023) (quotation marks and citation omitted).

We begin by examining the sufficiency of the evidence to support Hartsfield's resisting arrest conviction. First, he argues that police did not have probable cause to arrest him until after they recovered the firearm on his person and determined that he did not have a license to carry a firearm and was not permitted to possess a firearm. Hartsfield's Brief at 19. He points to Officer Litvinenko's testimony that he recovered the gun after he handcuffed Hartsfield, as well as the testimony of Officers Walls and Litvinenko that they did not observe Hartsfield engage in any criminal activity and had not received any information that Hartsfield may have been involved in a crime. ***Id.*** He contends that, because flight from police alone does not give rise to probable cause to arrest, the officers lacked probable cause to arrest him at the time of the alleged resistance. ***Id.*** at 19-20.

Second, Hartsfield argues that the Commonwealth failed to present any evidence that his actions created a substantial risk of bodily injury or required substantial force to overcome. ***Id.*** at 20. He contends the Commonwealth did not present evidence showing that Hartsfield's actions were physically forceful or that he injured or could have injured anyone. ***Id.*** Rather, he argues, the evidence merely showed that Officer Litvinenko deployed his taser to stop Hartsfield from running and that, once he was on the ground, the police officers could not "get his hands" at first. ***Id.***

The Pennsylvania Crimes Code defines the offense of resisting arrest or other law enforcement as follows:

> A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring substantial force to overcome the resistance.

18 Pa.C.S. § 5104. "This offense requires proof that a public servant was effecting a lawful arrest or discharging a legal duty 'other than arrest,' which the defendant intended to prevent, but "the phrase 'discharging any other duty' does not include police investigation following an unlawful arrest." ***Commonwealth v. Cahill***, ___ A.3d ___, 2024 WL 4128266 at *7 & n.8 (Pa. Super. filed Sept. 10, 2024) (citation omitted). "The Commonwealth does not need to establish actual injury. Instead, it may prove **either** that the defendant's actions created a substantial risk of serious bodily injury **or** that the defendant employed means justifying or requiring substantial force to overcome the resistance." ***Id.*** (emphasis in original; citation omitted).[12] "Merely exposing another to the risk of such injury is sufficient to sustain a conviction under Section 5104." ***Commonwealth v. Taylor-Dixon***, ___ A.3d

---

[12] We note that the Pennsylvania Supreme Court has granted allowance of appeal on the issue of what constitutes "substantial force to overcome the resistance" to establish resisting arrest. ***Commonwealth v. Crosby***, 307 A.3d 1204 (Pa. 2023) (per curiam). As ***Crosby*** remains pending before our Supreme Court at the time of this writing, we once again must follow the decisional law established by this Court in deciding this case. ***See Santiago***, 980 A.2d at 666 n.6.

___, 2024 WL 3959222 at *3 (Pa. Super. filed Aug. 28, 2024) (citation and quotation marks omitted). "[R]esisting arrest does not require the aggressive use of force such as striking or kicking of the officer. We have found that even passive resistance requiring substantial force to overcome provided sufficient evidence for upholding the resisting arrest conviction." *Id.* (citations and internal quotation marks omitted).

In analyzing the sufficiency of Hartsfield's resisting arrest conviction, the trial court found:

> Here, Hartsfield exhibited suspicious behavior in a high crime area. As Officer Walls exited his vehicle, Hartsfield abruptly turned and walked away from him. After taking four to five steps, Hartsfield broke into a full sprint away from Officer Walls. Hartsfield's hands were in his pockets from the time he turned to walk away from Officer Walls and remained in his pockets during the chase. In this case, the Commonwealth presented ample evidence to support [Hartsfield's] conviction for resisting arrest.

Trial Court Opinion, 12/19/2023, at 6.

As stated above, police had reasonable suspicion to believe criminal activity was afoot based upon his unprovoked flight in a high crime area. Viewing the evidence presented in the light most favorable to the Commonwealth, the record supports a finding that Hartsfield's continued flight intended to prevent the police officers from "discharging their duty" of effecting a brief detention of Hartsfield for investigation. As the plain language of the statute provides, a defendant's actions in preventing an officer from "discharging any other duty" would include conducting a *Terry* stop. *See Cahill*, 2024 WL 4128266 at *7 & n.8; 18 Pa.C.S. § 5104; *see also*

- 22 -

*Commonwealth v. Smith*, 172 A.3d 26, 32 (Pa. Super. 2017) ("The handcuffing of a suspect, by itself, does not convert an investigative detention into an arrest.").

The record further supports a finding that Hartsfield employed means which justified and required substantial force to overcome his resistance. *See Cahill*, 2024 WL 4128266 at *7 & n.8; *Taylor-Dixon*, 2024 WL 3959222 at *3. Officer Litvinenko testified that he "absolutely needed" to deploy his taser to stop Hartsfield from continuing to flee. N.T. (Trial), 6/28/2023, Exs. C-1A (Stipulation), C-1B (N.T., (Suppression), 1/5/2023, at 30, 38, 43-45, Exs. D-1 (Incident Report, 4/15/2022), D-2 (N.T. (Preliminary Hearing), 7/11/2022, at 8, 18-19)). Accordingly, the evidence admitted at the stipulated bench trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth, are sufficient to support Hartsfield's conviction of resisting arrest.

We next turn our attention to Hartsfield's conviction of flight to avoid apprehension. Hartsfield argues that the Commonwealth failed to introduce any evidence to show that he had been charged with a crime at the time he fled the police officers. Hartsfield's Brief at 21. He further contends the trial court erroneously relied on the fact that Hartsfield had a bench warrant for his arrest for a violation of probation to find him guilty, as the record shows that the parties never stipulated to this fact. *Id.*

The Pennsylvania Crimes Code defines the offense of flight to avoid apprehension, trial, or punishment, in pertinent part, as follows:

> A person who willfully conceals himself or moves or travels within or outside this Commonwealth with the intent to avoid apprehension, trial or punishment commits a felony of the third degree when the crime which he has been charged with or has been convicted of is a felony and commits a misdemeanor of the second degree when the crime which he has been charged with or has been convicted of is a misdemeanor.

18 Pa.C.S. § 5126(a).

The sole basis for the trial court's finding that the evidence sufficiently established the crime of flight to avoid apprehension was that "Hartsfield stipulated that on the date of this offense, there was an open bench warrant for his arrest for a violation of probation." Trial Court Opinion, 12/19/2023, at 7. Our review of the certified record, however, reveals that Hartsfield did not stipulate to this fact. In fact, "the Commonwealth concedes that the evidence presented was insufficient to sustain a conviction for flight to avoid apprehension as the Commonwealth did not present evidence that, at the time [Hartsfield] fled from police, he had been charged with a crime." Commonwealth's Brief at 7; *see id.* at 16, 23-26.

At trial, the Commonwealth offered Exhibit C-5, a proposed stipulation that on the date of the incident, there was an open bench warrant for Hartsfield's arrest for violation of probation. N.T., 1/28/2023, at 5-6. Hartsfield's counsel objected. *Id.* at 6. After an off-the-record discussion between counsel, Hartsfield's counsel specifically stated to the trial court that

Hartsfield was not stipulating to that fact. *Id.* at 7 (Defense counsel stating, "So there is no stipulation to the Defendant was a fugitive at or around the time of the [inaudible] arrest in this case" and the trial court responding, "Okay" and "All right.") (brackets in original). The parties proceeded with the admission of Exhibit C-6, a stipulation that Hartsfield did not have a permit to possess a concealed firearm. *Id.* The trial court then had the following exchange with the Commonwealth:

> THE COURT: All right. Let me just to [sic] back to C-5 so I understand this. Are you just letting that one go or are you going to produce something that there was a bench warrant?
>
> [THE COMMONWEALTH]: Your Honor, I'm not concerned with that.
>
> THE COURT: Okay.
>
> [THE COMMONWEALTH]: We're not concerned with the offense so the stipulation is not essential – is not essential to the Commonwealth's case. So that's fine.

*Id.* at 8; Commonwealth's Brief at 5 n.1 ("After discussion, the stipulation was not entered into evidence and the Commonwealth did not present any evidence regarding the open bench warrant."). It is thus clear from the record that the parties did not stipulate to the fact that Hartsfield had a bench warrant for his arrest on the date of the incident, nor is there any evidence of that fact contained in the certified record.

We therefore agree with Hartsfield and the Commonwealth that the record is devoid of any evidence showing that Hartsfield had an open bench warrant on the date in question or that he fled police because he was avoiding

apprehension for a crime. Consequently, the evidence admitted at the stipulated bench trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth, are insufficient to support Hartsfield's conviction of flight to avoid apprehension. We therefore vacate the judgment of sentence as to this conviction.

Although we vacate the flight to avoid apprehension conviction, the record reflects that the trial court sentenced Hartsfield to a probationary sentence to run concurrently to his term of incarceration imposed on his other convictions. **See supra**, note 7. Because our disposition does not disturb the trial court's overall sentencing scheme, we need not remand this matter for resentencing. **See Commonwealth v. James**, 297 A.3d 755, 770 (Pa. Super. 2023).

Judgment of sentence affirmed in part and vacated in part. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/26/2024