J-S13019-23

2023 PA Super 90

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                          :                  PENNSYLVANIA

Appellant   :

  :

  :

v.   :

  :

  :

QUISEAN BARNES   :   No. 1066 EDA 2022

Appeal from the Order Entered March 21, 2022
In the Court of Common Pleas of Philadelphia County
Criminal Division at CP-51-CR-0007051-2021

BEFORE:   NICHOLS, J., MURRAY, J., and STEVENS, P.J.E.*

OPINION BY MURRAY, J.:                             **FILED MAY 26, 2023**

The Commonwealth of Pennsylvania appeals the trial court's order granting suppression of a statement to police and evidence seized following an investigative stop of Quisean Barnes' (Barnes).[1]  After careful review, we reverse and remand for further proceedings.

The trial court summarized the evidence presented at the suppression hearing:

> On July 20, 2021, Officer [Marc] Kusowski and his partner were on patrol on the 3000 block of N. 8th Street in Philadelphia.  [N.T.,

---

* Former Justice specially assigned to the Superior Court.

[1] The Commonwealth has certified that the suppression order will terminate or substantially handicap the prosecution.  **See** Pa.R.A.P. 311(d) (permitting the Commonwealth to "appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

2/15/22, at] 7. According to Officer Kusowski, this area is an "extremely high-crime area" and is a "notorious area for shootings." *Id.* at [] 8. He also stated that they "routinely man a [radio patrol car (RPC)] to sit at either 8th and Clearfield or Garrett and Clearfield and they are not to be moved." *Id.* While on patrol, Officer Kusowski and his partner [were] traveling northbound on 8th Street, approaching Clearfield, when Officer Kusowski observed a crowd of about five or six people on the northeast corner of 8th and Clearfield. *Id.* at [] 7[.] Officer Kusowski testified that it appeared to him that once they saw the patrol vehicle, "they began to scatter and walk away in separate directions." *Id.* at [] 8.

[Barnes] began walking southbound, towards the patrol vehicle with at least one other male. *Id.* Officer Kusowski believes that the crowd was scattering because of the mere presence of his patrol vehicle. *Id.* After the crowd scattered, Officer Kusowski exited his vehicle to see if he could make observations outside of his patrol vehicle, see if someone had a gun, or see if someone discarded narcotics or a firearm. *Id.* at [] 8-9. As he stepped out of his vehicle, he saw [Barnes] again walking southbound. *Id.* at 9. He illuminated his flashlight to see if he could observe anything on [Barnes's] person. *Id.* Next, Officer Kusowski exited his vehicle and when he did so, [Barnes] fled. *Id.* Officer Kusowski testified that he did not activate any lights, sirens, or even engage in a conversation with [Barnes]. *Id.* [Barnes] fled[] approximately ten feet, where there was a vacant lot full of bramble. *Id.* Officer Kusowski stated that he did pursue [Barnes] into the lot. *Id.* Once [Barnes] tripped over some bramble, Officer Kusowski ordered [Barnes] to stop and put his hands up. *Id.* [Barnes] complied with the orders. *Id.*

During the pursuit, Officer Kusowski noticed that [Barnes] had a "black shoulder bag" that resembled a fanny pack. *Id.* While detaining [Barnes], Officer Kusowski's partner asked [Barnes] if he had a gun in the bag. *Id.* As Officer Kusowski goes to frisk the bag, [Barnes] stated that he had a gun in the bag. *Id.* at 10. Further, [Barnes] told the officers that he did not have a permit to carry and that he was on probation. *Id.*

Trial Court Opinion, 9/16/22, at 1-2.

- 2 -

Police arrested Barnes, who filed a pretrial suppression motion on September 17, 2021. On March 21, 2022, after a hearing, the trial court granted Barnes's motion, suppressing his statements and the evidence seized by police during the investigative stop. Trial Court Order, 3/21/22. The Commonwealth filed this timely appeal. The trial court and the Commonwealth have complied with Pa.R.A.P. 1925.

The Commonwealth presents the following issue:

> Did the [suppression] court err in concluding that police did not have reasonable suspicion to stop [Barnes] when he fled from the officers in a high-crime area?

Commonwealth's Brief at 4.

We first observe our scope and standard of review:

> When reviewing an order granting a defendant's motion to suppress evidence, "we are bound by that court's factual findings to the extent that they are supported by the record, and we consider only the evidence offered by the defendant, as well as any portion of the Commonwealth's evidence which remains uncontradicted, when read in the context of the entire record." **Commonwealth v. Wallace**, 615 Pa. 395, 42 A.3d 1040, 1048 (Pa. 2012) (citation omitted). "Our review of the legal conclusions which have been drawn from such evidence, however, is *de novo*, and, consequently, we are not bound by the legal conclusions of the lower courts." **Id.** (citation omitted). Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **See In re L.J.**, 622 Pa. 126, 79 A.3d 1073, 1087 (Pa. 2013).
>
> Further, Pa.R.Crim.P. 581 provides that "[t]he Commonwealth shall have the burden ... of establishing that the challenged evidence was not obtained in violation of the defendant's rights." Pa.R.Crim.P. 581(H). Specifically, the Commonwealth has the burden of "establish[ing] by a preponderance of the evidence that the evidence was properly obtained." **Commonwealth v.**

- 3 -

> *Galendez*, 27 A.3d 1042, 1046 (Pa. Super. 2011) (citation omitted).

*Commonwealth v. Smith*, 285 A.3d 328, 331-32 (Pa. Super. 2022).

The Commonwealth challenges the trial court's conclusion that police "did not have reasonable suspicion to stop [Barnes]." Commonwealth's Brief at 10 (quoting Trial Court Opinion, 9/16/22, at 4). In support, the Commonwealth cites cases holding that presence in a high-crime area coupled with unprovoked flight establishes reasonable suspicion that criminal activity is afoot. *Id.* at 11-12. According to the Commonwealth, the evidence established Barnes's presence in "an extremely high—high-crime area." *Id.* at 12 (quoting N.T., 2/15/22, at 8). The Commonwealth directs our attention to Officer Kusowski's testimony that he patrolled the area "all the time" due to violence. *Id.* (citation omitted). The Commonwealth asserts:

> The area was so bad that the police "routinely" designated an officer "to sit" on one of the street corners in a police car in an attempt to stem the violence.

*Id.* (quoting N.T., 2/15/22, at 8).

The Commonwealth states that as the officer and his partner drove down the street, people who were standing on the corner began to "scatter, or walk away in different directions, when they spotted the approaching police car." *Id.* at 12. Barnes walked toward the officers' car. *Id.* at 11-12. The Commonwealth observes that Barnes fled when Officer Kusowski "turned on his flashlight and began to get out of his car." *Id.* at 13.

Once [Barnes] fled unprovoked from the officers and did so in "an extremely high—high-crime area," … the officers had a reasonable suspicion to stop him. Accordingly, they were entitled to pursue him. *See Commonwealth v. McCoy*, 154 A.3d [813,] 819 [(Pa. Super. 2017)] ("[b]ecause police possessed reasonable suspicion, their pursuit of [the defendant] was lawful").

Commonwealth's Brief at 13. The Commonwealth disputes the trial court's conclusion that "Officer Kusowski did not have a reasonable suspicion to stop [Barnes]" and the court "properly suppressed the evidence" as contrary to the law. *Id.* (citing Trial Court Opinion, 9/16/22, at 4). We agree.

The Fourth Amendment to the United States Constitution, incorporated to states by and through the Fourteenth Amendment to the United States Constitution, and Article I, Section 8 of the Pennsylvania Constitution, protect citizens from "unreasonable searches and seizures." U.S. Const. amend. IV The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

*Id.* Similarly, Article I, Section 8 provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. 1, § 8.

This Court has explained:

> The law recognizes three distinct levels of interactions between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and (3) a custodial detention.
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond and therefore need not be justified by any level of police suspicion.
>
> In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.
>
> Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Jefferson*, 256 A.3d 1242, 1247-48 (Pa. Super. 2021)

(*en banc*) (citations, quotation marks and ellipses omitted).

> Regarding an investigatory stop:
>
> [T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity. These circumstances are to be viewed through the eyes of a trained officer.

*Commonwealth v. Thomas*, 273 A.3d 1190, 1197 (Pa. Super. 2022)

(citations and quotation marks omitted).

> In making this determination, we must give due weight ... to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the

circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

***Commonwealth v. Young***, 904 A.2d 947, 957 (Pa. Super. 2006) (citations and quotation marks omitted); ***accord Thomas***, 273 A.3d at 1197.

Here, the trial court recognized that unprovoked flight in a high-crime area may establish reasonable suspicion of criminal activity:

> Under Pennsylvania law, mere presence in a high crime area is insufficient to support a finding of reasonable suspicion. ***In re D.M II***, 781 A.2d 1161, 1163 (Pa. 2001). However, a court could consider "the fact that the stop occurred in a 'high crime area" in assessing the totality of the circumstances. ***In re D. M. II***, 781 A.2d at 1164. Further, unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a ***Terry*** stop under both federal and state [constitutions]. ***Commonwealth v. Jefferson***, 853 A.2d 404 (Pa. Super. 2004). Police officers may find reasonable suspicion to suspect criminal activity is afoot in a high crime area where an unprovoked citizen flees upon noticing the police. ***Jefferson***, 853 A.2d 404; ***see also In the Interest of J.G.***, 860 A.2d 185 (Pa. Super. 2004).

Trial Court Opinion, 9/16/22, at 3. Notwithstanding, the trial court concluded Officer Kusowski lacked reasonable suspicion to effectuate a ***Terry*** stop:

> The instant matter is distinguishable from ***Jefferson*** and ***In re D. M. In those cases, there was a either a radio call or the defendant abandoned and/or discarded evidence during the pursuit.*** Here, there was no radio call describing [Barnes], [Barnes] did not abandon evidence during the pursuit, nor did he flee during a lawful encounter with police. In this case, Officer Kusowski saw a group scatter and witnessed [Barnes] was southbound. As Officer Kusowski exits the car, [Barnes] began to run. Lastly, the gun was retrieved from [Barnes's] bag during a frisk and not abandoned. Therefore, Officer Kusowski did not have reasonable suspicion to stop [Barnes], and this court properly suppressed the evidence.

Trial Court Opinion, 9/16/22, at 4 (emphasis added). Upon careful review, we disagree with the trial court's analysis and conclusion.

The trial court adds an additional factor to its reasonable suspicion analysis, *i.e.*, a radio call describing the suspect. **See id.** The case law does not support this additional factor. In **Jefferson**, this Court addressed "whether the observation of [the] appellant in a high crime area and [his] flight from police combine to establish the familiar **Terry** standard of reasonable suspicion." **Jefferson**, 853 A.2d at 405. We recognized that **Illinois v. Wardlow**, 528 U.S. 119 (2000),

> [t]he United States Supreme Court held that although mere presence in a high crime area is insufficient to support a **Terry** stop, the additional factor of unprovoked flight was indeed relevant. The Court ultimately concluded that the two factors in combination were sufficient to satisfy the **Terry** standard of reasonable suspicion. **Id.** at 124.

**Jefferson**, 853 A.2d at 406. We further observed that the Pennsylvania Constitution affords no additional protections:

> Following [**Wardlow**], it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a **Terry** stop under the Fourth Amendment....

**Id.** at 406 (quoting **D.M. II**, 781 A.2d at 1164). While additional facts may negate reasonable suspicion, **Wardlow** requires no additional facts to establish reasonable suspicion. Thus, we conclude the trial court erred as a matter of law by imposing an additional requirement to its reasonable suspicion analysis. **See Commonwealth v. Washington**, 51 A.3d 895, 898 (Pa. Super. 2012) (recognizing the common elements between, *inter alia*,

***Wardlow***, ***Jefferson*** and ***D.M. II***, are that "the incident took place in a high crime area and the suspect fled upon being confronted by the police or recognizing police presence in the immediate area.")

Mindful of the foregoing, we review the evidence presented at the suppression hearing in a light most favorable to Barnes. ***See Smith***, 285 A.3d at 331-32. Officer Kusowski testified:

> [T]hat area is an extremely … high-crime area. It is one of our more notorious areas for shootings. We've had six people shot at a time, four people shot, two people shot. We would routinely man a [radio police car] to sit at either 8th and Clearfield or Garrett and Clearfield, and they are not to be moved.

N.T., 2/15/22, at 8. Officer Kusowski explained that on the evening of July 20, 2021, he and his partner were on routine patrol near the 3000 block of North 8th Street. ***Id.*** at 6-7. As the officers traveled northbound on 9th Street, Officer Kusowski

> observed a crowd of about five to six people on the northeast corner of 9th and Clearfield. … It appeared to me that once they saw my patrol vehicle, they all began to … scatter, walk away in separate direction [*sic*].
>
> ….
>
> … [S]ince the crowd began to scatter—and I believe this was happening because of the mere presence of my patrol vehicle. I went to exit my vehicle just to see if I can, maybe, make any observations outside of my patrol vehicle….
>
> As I went to do that, … [Barnes] was walking, again, southbound. I believe I illuminated my flashlight just to see – any of the males, if I could see anything on their person. And when I exited my vehicle, without activating my lights or sirens, or even engaging anyone in conversation, [Barnes] fled[.]

He was carrying a black shoulder bag, kind of like a fanny pack, but more square, rectangular. He fled, maybe ten feet, … only a couple of houses, where there was a break between the houses, … a vacant lot full of bramble.

… I did pursue him into that lot. Me and him began tripping. He tripped over some bramble. I ordered him to stop, put his hands up. He did so. He did comply. He couldn't get back up. At the same time, … my partner was now with me ….

[A]s I went to detain the male, my partner asked if he had a gun in the bag. Almost simultaneously, as I went to frisk it, he does reply yes, and I also feel a gun in that bag….

N.T., 2/15/22, at 7-9.

This testimony, viewed in a light most favorable to Barnes, established Barnes's unprovoked flight, upon seeing Officer Kusowski, in a high-crime area. Pursuant to **Wardlow**, **Jefferson**, and **D.M.II**, this evidence established reasonable suspicion sufficient to justify a **Terry** stop of Barnes. **See Washington**, 51 A.3d at 898. Our analysis does not conclude at this point.

Barnes argues that Officer Kusowski's investigative detention escalated into a custodial detention. Appellee's Brief at 11. According to Barnes:

In response to this unprovoked flight, and only in response to this unprovoked flight, Officer Kusowski armed himself with a taser and chased [Barnes] into an empty lot. While Officer Kusowski had [Barnes] cornered in the lot, on his knees, he pointed the taser at [Barnes], ordered him stop and to place his hands up. [Barnes] placed his hands up around his face. At this point Officer Kusowski testified he was "taking [Barnes] into custody" and handcuffing him. (N.T., 2/15/22, at 14).

**Id.** Barnes claims these actions occurred at the same time Officer Kusowski's partner asked Barnes whether he had a firearm. **Id.** Barnes argues that the

officers' coercion and questioning took place prior to the recovery of the firearm. *Id.* at 11-12. The trial court did not determine whether the encounter became a custodial detention.

An investigative detention may develop into a custodial detention. *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019). "The key difference between an investigative and a custodial detention is that the latter involves such coercive conditions as to constitute the functional equivalent of an arrest*." Commonwealth v. Gonzalez*, 979 A.2d 879, 887 (Pa. Super. 2009) (emphasis added, citation and quotation marks omitted). This Court considers the totality of circumstances to determine if an encounter is investigatory or custodial. *See Commonwealth v. Goldsborough*, 31 A.3d 299, 306 (Pa. Super. 2011).

We have explained:

The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

*Commonwealth v. Baker*, 24 A.3d 1006, 1019-20 (Pa. Super. 2011) (citations omitted).

At the suppression hearing, Officer Kusowski testified:

I didn't use my taser, but I did order him to the ground with my taser. Although I feared that he may have been armed, it would not have been safe for me to point my duty weapon at anyone

- 11 -

because we're literally tripping. So I didn't want to pull my duty weapon out for fear of an accidental discharge. So I pointed my taser at him and ordered him to the ground.

N.T., 2/15/22, at 12-13.

On cross-examination, Officer Kusowski further testified:

Q. [Defense counsel:] Officer, when he's down on his knees, with his hands in the air, cornered in that alley by you, obviously, he couldn't go anywhere at that point?

A. [Officer Kusowski:] No. No. Neither -- I don't think either of us could have gone anywhere.

*Id.* at 21. Officer Kusowski explained that when Barnes fell to the ground, the other officer ordered Barnes to put his hands up. *Id.* at 17. When the other officer asked if there was a gun in the bag, Barnes replied, "Yes, sir." *Id.* at 18.

As this Court explained, a "***Terry*** stop" is "[a]n investigative detention [that] occurs when a police officer temporarily detains an individual **by means of physical force or a show of authority** for investigative purposes." ***Commonwealth v. Barber***, 889 A.2d 587, 592 (Pa. Super. 2005) (emphasis added). Here, our review discloses that Officer Kusowski's use of force and/or show of authority had not escalated to a custodial detention at the time Appellant acknowledged possessing a firearm. Thus, the totality of the circumstances demonstrates Officer Kusowski effected an investigatory stop of Barnes supported by reasonable suspicion of criminal activity. ***See*** ***Washington***, 51 A.3d at 898. Consequently, we reverse the trial court's order suppressing the evidence seized as a result of the investigatory stop.

- 12 -

Order reversed.  Case remanded for further proceedings consistent with this Opinion.  Jurisdiction relinquished.

P.J.E. Stevens joins the opinion.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2023