J-S05022-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| JOSEPH MICUCCI | : | No. 1135 EDA 2024 |

Appeal from the Order Entered April 2, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008386-2023

BEFORE: BOWES, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:           **FILED MARCH 3, 2025**

The Commonwealth appeals from the order granting Joseph Micucci's (Defendant) motion to suppress physical evidence seized from Defendant during a traffic stop. After careful review, we reverse and remand for further proceedings.

On November 16, 2023, at 6:37 p.m., Philadelphia Police Officers Marc Kusowski (Officer Kusowski) and Anthony Rumano (Officer Rumano) encountered a large pickup truck at the corner of Louden Street and C Street in Philadelphia. N.T., 4/1/24, at 15-16. The truck was illegally parked in a crosswalk and partially blocking traffic. *Id.* The truck was running and Defendant, seated in the front passenger seat with the door open, was its only

_____

[*] Former Justice specially assigned to the Superior Court.

occupant.  *Id.* at 16.  Defendant indicated the driver was in the nearby corner store.  *Id.*  While Officer Kusowski went to find the driver, Officer Rumano spoke with Defendant.  *Id.* at 17, 40.

Defendant had a food container on his lap, and indicated he had stopped at the store to get food.  Exhibit C-10 (Officer Rumano's body-worn camera footage).  Defendant began to open the food container, and Officer Rumano asked him to "maybe hang off on eating for a second."  *Id.*  Officer Rumano asked to see Defendant's identification, which Defendant provided.  *Id.*  Defendant stated, "I don't know what I did wrong."  *Id.*  Officer Rumano replied, "You're in a car that's being stopped by the police, that's all."  *Id.*  Officer Rumano continued, "I'm just going to ask you a couple questions.  I ask everyone the same questions."  *Id.*  Officer Rumano asked if Defendant was on probation or parole, and Defendant stated he was on parole.  *Id.*  Officer Rumano later testified he felt Defendant was becoming "increasingly nervous."  N.T., 4/1/24, at 41.  When Officer Rumano asked Defendant if there was any reason why he was nervous, Defendant responded there was not.  Exhibit C-10.

Meanwhile, after Officer Kusowski encountered the driver in the store, the driver returned to the truck and provided his license and registration.  N.T., 4/1/24, at 17-18, 22.  When Officer Kusowski headed toward his police vehicle to run a check on the license and registration, he observed Officer

Rumano's body language, felt "something was not right," and approached to assist Officer Rumano. *Id.* at 22.

Inside of the truck, Defendant had a satchel with its strap over his shoulder. *Id.* at 41. Officer Rumano asked if Defendant had any weapons on himself or in his satchel, and Defendant stated he did not. Exhibit C-10. Officer Rumano asked if Defendant was willing to show him the satchel, and Defendant replied, "Yeah, I can show you my bag." *Id.* At that time, Officer Rumano asked Defendant to exit the truck, and Defendant complied. *Id.*[1]

When Defendant exited the truck, the officers immediately observed a firearm in the pocket of Defendant's hooded sweatshirt. N.T., 4/1/24, at 23-24, 43. Officer Kusowski ordered Defendant to stop and announced that Defendant had a gun in his pocket. *Id.* at 23-24. Defendant then attempted to charge through the officers, who tackled him. *Id.* at 23-25, 43. Defendant struggled against the officers, who seized the firearm from his sweatshirt pocket and subdued him with a taser. *Id.* at 25-26, 43. The officers arrested Defendant, and recovered from the satchel $29,064 in cash and a bottle containing twelve oxycodone pills. *Id.* at 26-27.

_____

[1] Officer Rumano testified that he asked Defendant to exit the truck for "officer safety reasons." N.T., 4/1/24, at 42. Officer Rumano also testified that he asked Defendant to exit the truck, in part, because the truck was "lifted," which meant Defendant was elevated "higher th[a]n a normal … interaction with a car stop." *Id.*; *see also id.* at 18 (Officer Kusowski's testimony that the truck was "really high"; that Officer Kusowski is six feet tall and "the seat level may have come to my chest….").

The Commonwealth subsequently charged Defendant with one count each of possession with intent to deliver a controlled substance, possession of a controlled substance, possession of a firearm by a prohibited person, carrying a firearm without a license, carrying a firearm on public streets in Philadelphia, and resisting arrest.[2]  **See** Information, 12/8/23.

On February 28, 2024, Defendant filed a motion to suppress physical evidence, arguing he "was subjected to a seizure and investigatory detention without reasonable suspicion or probable cause."  Motion to Suppress, 2/28/24, ¶ 4.  On April 1, 2024, the suppression court held a hearing on the motion.  Officers Kusowski and Rumano testified, and the Commonwealth introduced videos from the officers' body-worn cameras.  **See** Exhibit C-10; Exhibit C-11 (Officer Kusowski's body-worn camera footage).  Defendant offered no evidence.

At the hearing's conclusion, the suppression court issued its factual findings on the record.  **See** N.T., 4/1/24, at 62-67.  The court found all of the officers' testimony credible, except for Officer Rumano's testimony that Defendant's "hands [we]re a little shaky" when Defendant was retrieving his identification.  **Id.** at 41.  The court stated:

> In the body-worn camera[,] there's nothing to indicate or show that [D]efendant's hand[s] are shaking in any way. [D]efendant's hands appear in front … the entire time as they are visible on the body-worn camera.  Now, of course the body-worn

---

[2] 35 P.S. § 780-113(a)(30), (16); 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 6108, 5104.

camera doesn't always pick up the [officer's] approach or some of it.

*Id.* at 66. The court further stated:

I find that the officers were credible for all their testimony except for the issue of the hand shaking[,] which the body-worn camera shows something different. The[ officers are] not necessarily credible on that but everyone's memory is different. [Defendant's arrest occurred in] November of last year and … I think … both [officers have] made one hundred plus arrests in the interim.

*Id.* at 67.

The court ultimately granted Defendant's suppression motion, stating:

There was no reason to stop [D]efendant who [was] a passenger in a parked vehicle. There's nothing to indicate whatsoever that [D]efendant was nervous. [The] body-worn camera … gives a different story from the officers' testimony. The stop occurred the minute the officer took [Defendant's] identification. There was no reasonable suspicion or probable cause at that point in time.

*Id.*; *see also id.* at 13 (suppression court stating, "my biggest issue is … it is a stop the minute you take the [identification].").

The Commonwealth timely appealed.[3] The Commonwealth and the suppression court have complied with Pa.R.A.P. 1925.

The Commonwealth presents a single question for our review: "Did the [suppression] court err in suppressing a firearm and other evidence seized from [D]efendant during a lawful traffic stop?" Commonwealth Brief at 4.

_____

[3] In its notice of appeal, the Commonwealth certified that the suppression order will terminate or substantially handicap the prosecution. *See* Pa.R.A.P. 311(d) (permitting the Commonwealth to "appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution").

The Commonwealth argues the suppression court's "ruling is based on a fundamental misunderstanding of the relevant law." *Id.* at 15. The Commonwealth maintains the officers did not need reasonable suspicion or probable cause to require Defendant to provide identification or exit the truck. *Id.* at 20. The Commonwealth argues that, during a traffic stop, officers "may ask any passengers to provide identification" without reasonable suspicion that the passengers are involved in criminal activity. *Id.* at 16 (citing *Commonwealth v. Bumbarger*, 231 A.2d 10, 18 (Pa. Super. 2020)). The Commonwealth further argues officers may "control all movement in a traffic encounter," including that of a passenger. *Id.* (quoting *Commonwealth v. Pratt*, 930 A.2d 561, 567 (Pa. Super. 2007). The Commonwealth maintains officers may order a passenger to exit the vehicle "as a matter of right." *Id.* at 17 (quoting *Commonwealth v. Mack*, 953 A.2d 587, 589 (Pa. Super. 2008)). According to the Commonwealth, the officers "recovered [Defendant's] gun as a result of their asking [D]efendant to step out of the truck, which they were entitled to do during the traffic stop." *Id.* at 21. The Commonwealth further asserts the officers recovered the drugs and money in a lawful "search incident to [Defendant's] arrest[.]" *Id.*

Defendant disagrees, arguing that the encounter was an investigative detention requiring reasonable suspicion, which the officers lacked. *See* Defendant's Brief at 10-20. Defendant argues that because "the truck was already parked [and Defendant] sat in the passenger seat with the door open,"

the encounter should not be considered a traffic stop, but rather a pedestrian stop. *Id.* at 8. Even if the encounter is considered a traffic stop, Defendant asserts, the officers' "investigation went significantly [and] measurably beyond that necessary to enforce a parking violation, and therefore was unlawful[,] even pursuant to the Commonwealth's cited cases involving a vehicle 'stop.'" *Id.* Defendant maintains the officers "[a]sking whether [Defendant] was on probation or parole [and] if they could search his bag … is completely unnecessary" for enforcing a parking violation. *Id.* at 14. Defendant argues "the duration of the stop [and the] scope of the investigation, which included unnecessary interrogation, were well outside of what is allowed by the Commonwealth's own cases cited." *Id.* (citing *Mack*, 953 A.2d at 589; *Bumbarger*, 231 A.3d at 18; *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

> We review suppression court orders
>
> to determine whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record. In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the [defendant's] witnesses along with the Commonwealth's evidence which remains uncontroverted. Our scope of review of suppression court factual findings is limited to the suppression hearing record. We, however, are not bound by a suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary.

*Commonwealth v. Anderson*, 276 A.3d 282, 292 (Pa. Super. 2022) (*en banc*) (quoting *Commonwealth v. Barr*, 266 A.3d 25, 39 (Pa. 2021)); *see*

***also Commonwealth v. Kuhlman***, 300 A.3d 460, 464 (Pa. Super. 2023) (the appellate court's duty "is to determine if the suppression court properly applied the law to the facts.").

"The Fourth Amendment to the United States Constitution, incorporated to states by and through the Fourteenth Amendment to the United States Constitution, and Article I, Section 8 of the Pennsylvania Constitution, protect citizens from 'unreasonable searches and seizures.'" ***Commonwealth v. Barnes***, 296 A.3d 52, 56 (Pa. Super. 2023). This Court has explained:

> The law recognizes three distinct levels of interactions between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a ***Terry*** stop, ***see Terry v. Ohio***, 392 U.S. 1 (1968); and (3) a custodial detention.
>
> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond and therefore need not be justified by any level of police suspicion.
>
> In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.
>
> Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

***Commonwealth v. Jefferson***, 256 A.3d 1242, 1247-48 (Pa. Super. 2021) (*en banc*) (citations, quotation marks, and ellipses omitted).

> As provided for by statute, anytime a police officer has "reasonable suspicion" to believe a violation of the Motor Vehicle

Code is occurring or has occurred, the officer may initiate an investigatory vehicle stop. 75 Pa.C.S.A. § 6308. Incident to this stop, an officer may check the vehicle's registration, the driver's license and obtain any information necessary to enforce provisions of the motor vehicle code. *Commonwealth v. Rosas*, 875 A.2d 341, 346 (Pa. Super. 2005).

*Mack*, 953 A.2d at 589 (footnote omitted); *see also Commonwealth v. Campbell*, 862 A.2d 659, 663 (Pa. Super. 2004) ("A forcible stop of a motor vehicle by a police officer constitutes a seizure of a driver and the occupants; this seizure triggers the protections of the Fourth Amendment.").

Regarding the rights of passengers during traffic stops, this Court has observed:

In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the United States Supreme Court held that police may require the driver of a lawfully stopped vehicle to exit the vehicle without any additional probable cause or reasonable suspicion[,] without violating an individual's Fourth Amendment rights. In so holding, the Court balanced the need to protect police officers from the serious and substantial dangers inherent in traffic stops, and the relatively minor intrusion upon the privacy rights of the driver in situations where the vehicle has been lawfully stopped.

Subsequently, this Court applied the rationale of *Mimms* to allow a police officer to order passengers in a lawfully stopped vehicle to exit that vehicle where the officer has an articulable and reasonable suspicion that criminal activity may be afoot. *See Commonwealth v. Baer*, 654 A.2d 1058 (Pa. Super. 1994); *Commonwealth v. Elliott*, 546 A.2d 654 (Pa. Super. 1988).

Several years later, in *Commonwealth v. Brown*, 654 A.2d 1096 (Pa. Super. 1995), this Court, again relying on *Mimms*, retreated from this reasonable suspicion standard and held that "police may request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that criminal activity is afoot." *Brown*, 654 A.2d at 1102. In so holding, we opined that "in all cases involving lawful traffic stops, it is not unreasonable for an officer to request that the passengers

in a lawfully stopped car exit the vehicle so that the safety of the officer is, if not insured, at least better protected." *Id.* at 1102 n.5.

> In *Maryland v. Wilson*, 519 U.S. 408 (1997), the United States Supreme Court explicitly extended the rule of *Mimms*, as this Court had in *Brown*, stating:

>> In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.

> *Wilson*, 519 U.S. at 414-15. Thus, **following a lawful traffic stop, an officer may order both the driver and passengers of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot**.

*Pratt*, 930 A.2d at 564 (Pa. Super. 2007) (citations modified; emphasis added); *see also Mack*, 953 A.2d at 589 ("police may request both drivers and their passengers to alight from a lawfully stopped car as a matter of right."); *Campbell*, 862 A.2d at 663-64 (quoting *Wilson*, 519 U.S. at 414) ("The [*Wilson*] Court found that the interest in officer safety outweighs the minor intrusion on passengers who are 'already stopped by virtue of the stop of the vehicle.'"). "Furthermore, **police can require both the driver and the passengers in a lawfully stopped vehicle to identify themselves regardless of whether there is reasonable suspicion that the passengers are engaged in criminal activity**." *Bumbarger*, 231 A.3d at 17-18 (citing *Campbell*, 862 A.2d at 664-65) (emphasis added).

- 10 -

We have recognized that "roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *In re O.J.*, 958 A.2d 561, 564 (Pa. Super. 2008) (*en banc*) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983)); *see also Mimms*, 434 U.S. at 110 (observing "that a significant percentage of murders of police officers occurs when the officers are making traffic stops" (citation omitted)); *Brown*, 654 A.2d at 1102 (observing that "due to the nature of the potential danger, an officer's concerns can only *increase* with the number of occupants in a car" (italics in original)). As the United States Supreme Court has observed,

> the risk of a violent encounter in a traffic-stop setting "stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." [*Wilson*, 519 U.S. at 414]. "[T]he motivation of a passenger to employ violence to prevent apprehension of such a crime … is every bit as great as that of the driver." [*Id.*]

*Johnson*, 555 U.S. at 331-32.

Similarly, this Court has recognized

> that when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car. Allowing police officers to control all movement in a traffic encounter is a reasonable and justifiable step towards protecting their safety.

*Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019) (citations, quotation marks, ellipses, and brackets omitted); *see also Pratt*, 930 A.2d at 567 (officers' authority to control all movement during a traffic

- 11 -

stop applies even where multiple officers are present, and does not depend "on the ratio between officers and vehicle occupants").

Instantly, the suppression court opined that it

> properly granted the motion to suppress because the officers subjected Defendant to an investigative detention without reasonable suspicion. It is clear from the facts of the instant case that a reasonable person in Defendant's position would not believe they were free to leave.

Suppression Court Opinion, 6/4/24, at 4; *see also id.* ("An investigative detention, *i.e.*, a **Terry** stop, occurs when, based on the totality of the circumstances, a reasonable person would believe that they were not free to go and were subject to police orders.") (citing **Commonwealth v. Plante**, 914 A.2d 916, 921-22 (Pa. Super. 2006)).

The suppression court stated the officers

> approached Defendant while he was sitting and eating food in the passenger side of a parked vehicle. They then asked to see his [identification] and instructed him to stop eating. N.T.[, 4/1/24, at 40-41]. Therefore, the officers conducted an investigative detention starting from the time they asked Defendant for his [identification], and were required to have a reasonable suspicion that criminal activity was afoot and that Defendant was involved. The record shows no such reasonable suspicion.
>
> The officers approached the vehicle because it was illegally parked. [**Id.** at 15-16]. At the time of their approach, Defendant was not in the driver's seat of the vehicle, and Defendant immediately told [the officers] that the driver was inside the [corner store], which the officers confirmed. [**Id.** at 16]. Therefore, there could be no reasonable suspicion that Defendant was involved in the criminal activity—here, illegally blocking a crosswalk—that was afoot.
>
> The behavior [the] officers alleged was "suspicious" began after the investigate detention was underway, and the body-worn

camera footage contradicts [the officers'] characterization of Defendant's behavior. [*Id.* at 41 (Officer Rumano's testimony that] Defendant becomes nervous as [Officer Rumano] is speaking with him, around the time [Officer Kusowski] returns from the [store])…. Officer Rumano testified that Defendant's increasingly nervous demeanor, including shaking hands, was a large part of the reason [Officer Rumano] became suspicious, asked to search Defendant's bag, and had Defendant exit the vehicle. [*Id.* at 41]. [Officer Rumano] specifically noted Defendant's hands were shaking as he got his [identification]. However, the body-worn camera footage contradicted this testimony. [The suppression c]ourt, having reviewed the footage, determined that Defendant's hands were not shaking during the encounter, and that "there's nothing to indicate whatsoever that [D]efendant was nervous." [*Id.* at 66-67]. It is therefore clear from the record that [the] officers did not have the reasonable suspicion or probable cause required to detain Defendant, and that [the suppression c]ourt properly granted the motion to dismiss.

Suppression Court Opinion, 6/4/24, at 4-5 (paragraph breaks added).

Our review discloses the suppression court's factual findings are supported by the record; however, its legal conclusion is erroneous. Because Defendant was a passenger in a vehicle subject to a lawful traffic stop,[4] the officers could require Defendant to provide identification and exit the vehicle without reasonable suspicion that he was involved in criminal activity. **See Pratt**, 930 A.2d at 564; **Bumbarger**, 231 A.3d at 17-18. The suppression

_____

[4] Defendant cites no authority in support of his argument that the encounter should be considered a pedestrian stop rather than a traffic stop. **See** Defendant's Brief at 8, 16. The suppression court specifically found Defendant was "a passenger in a parked vehicle." N.T., 4/1/24, at 67. It is undisputed that the truck was parked in violation of the Motor Vehicle Code. **See** 75 Pa.C.S.A. § 3353 (prohibiting parking in a crosswalk); **see also** N.T., 4/1/24, at 11-12 (suppression court stating, "It's an egregious parking violation, no doubt," and Defendant's counsel indicating agreement); Defendant's Brief at 16 (acknowledging "the truck was obviously illegally parked").

court therefore erred in determining Officer Rumano's request that Defendant provide identification triggered an investigative detention requiring reasonable suspicion. While Defendant may have believed he was not free to leave, passengers in lawfully stopped vehicles are never free to leave, but rather are subject to the officers' authority to "control all movement in a traffic encounter." **Wright**, 224 A.3d at 1109; **see also Johnson**, 555 U.S. at 333 ("a traffic stop of a car communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will.").

Our review discloses that, when Defendant exited the truck, the officers immediately observed the firearm in Defendant's sweatshirt pocket. Because "police may request … passengers to alight from a lawfully stopped car without reasonable suspicion that criminal activity is afoot," **Brown**, 654 A.2d at 1102, it is immaterial whether Defendant in fact displayed nervousness or otherwise aroused the officers' suspicion before requiring him to exit the truck. Upon the officers' immediate observation of the firearm, Defendant attempted to flee and struggled with the officers. The officers lawfully seized the firearm during the struggle, and recovered the drugs and money from Defendant's satchel in a lawful search incident to arrest. As the officers recovered the

evidence without violating Defendant's constitutional rights,[5] it should not have been suppressed. Accordingly, we reverse the suppression court's order.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/3/2025

---

[5] Defendant's argument that Officer Rumano's questions to Defendant were "completely unnecessary" to enforce the parking violation is unavailing. Defendant's Brief at 14. The United States Supreme Court has held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." **Johnson**, 555 U.S. at 333 (citation omitted); **see also Rodriguez v. U.S.**, 575 U.S. 348, 354 (2015) ("the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." (citations omitted)); **Commonwealth v. Ross**, 297 A.3d 787, 798 (Pa. Super. 2023) (officer asking whether driver "had a firearm was not investigative and falls within the category of actions police officers may undertake during a lawful traffic stop based solely on concerns for their safety and security and without independent justification or cause."). As Officer Rumano's conversation with Defendant addressed safety concerns and occurred primarily while Officer Kusowski dealt with the driver, it did not impermissibly extend the stop. Our review discloses just over two minutes elapsed between the officers' first contact with Defendant and their observation of his firearm. **See** Exhibits C-10 and C-11. Officer Kusowski spent less than twenty seconds assisting Officer Rumano with Defendant before observing the firearm. **Id.**