J-S04026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JESUS CONTRERAS CARREON | : | No. 1302 EDA 2024 |

Appeal from the Order Entered May 3, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0005654-2023

BEFORE: OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY STABILE, J.:                **FILED JULY 30, 2025**

The Commonwealth of Pennsylvania appeals from an order granting the motion of Appellee, Jesus Contreras Carreon, to suppress all evidence seized in connection with a traffic stop on March 9, 2023. We vacate the order granting suppression and remand for further proceedings.

Appellee was charged with possession with intent to deliver a controlled substance and related offenses. Appellant filed a motion to suppress all evidence seized in connection with the traffic stop. The court summarized the evidence adduced during the suppression hearing as follows:

> [T]his Court heard testimony from Police Officer James Chabot and argument from Commonwealth and Appellee. Police Officer James Chabot (hereinafter "TFO Chabot") at the time of his testimony, had approximately twenty-eight years of experience as a law enforcement officer. He was a beat cop for several districts within Philadelphia, Pennsylvania before becoming a member of the Philadelphia Highway Patrol for about three years. TFO Chabot

_____

[*] Retired Senior Judge assigned to the Superior Court.

was then a firearms instructor for "about ten or eleven years." He has been in "Narcotics since roughly 2016" and has "been with the DEA [for] just about five years[.]" TFO Chabot is now assigned to a Drug Enforcement Administration ("DEA") Task Force. Specifically, he is assigned to a several-year investigation of Group 51, a "large-scale drug trafficking organization and money laundering organization."

During the investigation, approximately two weeks prior to the traffic stop in this matter, the DEA obtained information from "a confidential source that a money pickup was going to take place." The "money drop" was "scheduled in the South Philadelphia area, where a member who was identified as a known money courier for the organization was located in a large parking lot; and a gentleman delivered a large bag containing a large sum of money to him[.]" The individual who delivered the money was identified as "Contreras" (not the Appellee). "Contreras" was followed by officers back to the area of 1800 South 9th Street, Philadelphia, Pennsylvania 19148. Chabot did not personally observe the events that took place but his fellow officers relayed the information to him. The DEA recovered approximately $175,000 to $225,000 from the money drop. At the time of the transaction a black Jeep Cherokee was present.

After the "money drop," the South 9th Street location became a priority interest and TFO Chabot "surveilled it on several occasions," including March 9, 2023. The location is a "corner property. It had three doors: one marked Number 1, which [was] believed to be the first floor; another door marked Number 2 ... [was] believed to be the second floor; and the side door, which ... led to a basement or whatever .... " On March 9, 2023, TFO Chabot observed the Appellee exit the property on South 9th Street and look "back and forth several times, up and down the block." Appellee then unlocked a gray Jeep Grand Cherokee across the street and proceeded to enter the driver seat. TFO Chabot then observed "Contreras" leave the same property holding a "large two-handled shopping bag" that he could not see inside. TFO Chabot also found the bag to be consistent with the types of packaging commonly used by the organization. The bag appeared to be "obviously" weighted because "Contreras" was walking with his "left shoulder down/right shoulder up, indicating that the bag was squared off, and it was some weight to the bag."

"Contreras" placed the bag in the driver-side rear of the gray Jeep Grand Cherokee, walked back across the street to lock the property, and then entered the passenger seat of the gray Jeep Grand Cherokee. TFO Chabot was familiar with both "Contreras" and the Appellee "[t]hrough confidential sources and an ongoing investigation." TFO Chabot believed that the bag "Contreras" placed in the gray Jeep Grand Cherokee "contained either United States currency or narcotics. " After his observations, TFO Chabot made contact with the Philadelphia Police Department; Police Officer Basquilli, who was on standby, initiated a traffic stop. It was stipulated by Appellee and the Commonwealth that the officer "did not observe any motor vehicle violations or anything of that nature," but instead stopped the vehicle at the direction of TFO Chabot.

Pa.R.A.P. 1925 Opinion, 7/3/24, at 2-4 (record citations omitted).

Appellee asserted in his motion to suppress that the "police had no probable cause to pull his vehicle over," and therefore the seizure of evidence from the car violated his constitutional rights. Motion To Suppress, 2/1/24, at ¶¶ 2-3. Since the stop was illegal, he continued, all evidence obtained following the stop was the fruit of the poisonous tree. *Id.* at ¶ 4. Furthermore, based on the seizure of money from the car, the police obtained a search warrant for the apartment on 1800 South 9th Street. *Id.* at ¶ 5. Appellant asserted that the search warrant "was the fruit of the illegal stop of the car" and that the search of the apartment violated his constitutional rights. *Id.* at ¶ 6.

On April 5, 2024, the court held a suppression hearing. The testimony during the suppression hearing only concerned the events leading up to the stop of Appellant's vehicle on March 9, 2023. The parties stipulated that the only question in this case was whether probable cause existed to stop

Appellant's vehicle. N.T., 4/5/24, at 18 (prosecutor's statement that "there's a stipulation by and between counsel that the probable cause for the stop is what -- and nothing after this point is what the motion is going to rise and fall on").[1]

On April 15, 2024, the court granted Appellee's motion to suppress. The Commonwealth filed a motion for reconsideration, which the court denied, and a timely interlocutory appeal to this Court asserting that the order granting suppression substantially handicapped the prosecution. Both the Commonwealth and the court complied with Pa.R.A.P. 1925.

The Commonwealth raises a single issue in this appeal, "Did the lower court erroneously suppress the $250,000 in cash found in [Appellee's] car and

_____

[1] As a result of this stipulation, there was no evidence introduced concerning the search of Appellee's car following the traffic stop or the search of the residence at 1800 South 9th Street. It appears from the affidavit of probable cause appended to Appellee's criminal complaint that (1) at approximately 2:15 p.m. on March 9, 2023, the Honorable Zachary Schaffer signed a search warrant relating to the car, and (2) at approximately 2:45 p.m. on the same date, the Honorable Charles Ehrlich signed a search warrant relating to 1800 South 9th Street. According to the same affidavit, the police recovered the black shopping bag from the car that contained what police estimated was in excess of $250,000.00. During the search of the house, the police recovered one Glock handgun, nine kilograms of fentanyl, one money counter, one heat sealer, packaging materials, one cell phone, numerus documents and an unknown amount of United States currency. Neither of these search warrants were introduced into evidence during the suppression hearing, and neither are in the certified record.

the handgun and 9 kilograms of fentanyl found in his residence?" Commonwealth's Brief at 4.[2]

In an appeal by the Commonwealth from an order granting a motion to suppress, our standard of review is as follows:

> When reviewing an order granting a defendant's motion to suppress evidence, we are bound by that court's factual findings to the extent that they are supported by the record, and we consider only the evidence offered by the defendant, as well as any portion of the Commonwealth's evidence which remains uncontradicted, when read in the context of the entire record. Our review of the legal conclusions which have been drawn from such evidence, however, is *de novo*, and, consequently, we are not bound by the legal conclusions of the lower courts. Moreover, our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing.

***Commonwealth v. Barnes***, 296 A.3d 52, 55 (Pa. Super. 2023).

There are three categories of interactions between police officers and citizens: (1) a "mere encounter" or request for information, which does not need to be supported by any level of suspicion and carries no official compulsion to stop or to respond; (2) an "investigative detention," which subjects a suspect to a stop and some period of detention and must be supported by reasonable suspicion of criminal activity; and (3) an arrest or custodial detention, which must be supported by probable cause. ***Commonwealth v. Metz***, 332 A.3d 92, 98 (Pa. Super. 2025). The only

_____

[2] Appellee did not file an appellate brief.

question litigated during the suppression hearing was whether the traffic stop of Appellant's vehicle was constitutional.

Some traffic stops require reasonable suspicion, while other traffic stops require a higher standard of probable cause. Where an officer reasonably suspects criminal activity or a Vehicle Code violation but needs to conduct further investigation into whether such activity has occurred, he only needs reasonable suspicion to make the stop. **Commonwealth v. Salter**, 121 A.3d 987, 993 (Pa. Super. 2015). If it is not necessary to stop a vehicle to establish that a Vehicle Code violation has occurred—for example, when the officer observes a vehicle speeding—the officer must possess probable cause to stop the vehicle. **Id.** In the present case, the police only needed reasonable suspicion to stop Appellant's vehicle, because further investigation was necessary to determine whether the vehicle contained evidence of criminal activity in the form of drug-related money. **See Commonwealth v. Ellis**, 662 A.2d 1043, 1048 (Pa. 1995) (applying reasonable suspicion standard to traffic stop and concluding that police officer stopped vehicle based on reasonable suspicion that defendant had committed burglary and was using vehicle to leave scene of the crime); **Commonwealth v. Knupp**, 290 A.3d 759, 767-68 (Pa. Super. 2023) (applying reasonable suspicion standard and determining that officer stopped vehicle based on reasonable suspicion that defendant was using vehicle to engage in drug-related criminal activity).

The trial court analyzed the evidence as follows:

Here, the DEA received information from a confidential source regarding the location of a money pickup and the individuals involved, which occurred two weeks prior to the search of the Appellee's vehicle. TFO Chabot did not testify that the source made police aware of the origin of the money's location or where "Contreras" would be coming from on the night of the money drop. In fact, it wasn't until after the police followed "Contreras" to the property on South 9th Street that they became aware of it, developed an interest in the location, and made it a surveillance priority. Further, there was no testimony indicating that anyone was observed at any point during the several surveillances at the South 9th Street location committing any criminal activity or even exhibiting suspicious behavior to lay a foundation for probable cause or reasonable suspicio[n]. Therefore, this Court had "no information that the money actually came from that location."

Additionally, this Court had no information from where in that building "Contreras" or Appellee exited on March 9, 2023, and whether it was the same at the time of the money drop. In TFO Chabot's description of the property at 1800 South 9th Street, it is evident that the building houses two separate apartments, with a possible third one as well. TFO Chabot testified that he observed both Appellee and "Contreras" exit the property at different times but was silent to which door each exited from.

TFO Chabot observed [that] the Appellee exited the property on South 9th Street and looked "back and forth several times, up and down the block." Appellee then unlocked a gray Jeep Grand Cherokee across the street and proceeded to enter the driver seat. TFO Chabot then observed "Contreras" leave the property holding a "large two-handled shopping bag" that he could not see inside. TFO Chabot observed "Contreras" and the Appellee on March 9, 2023, from "between 30 to 60 feet away[.]" Although he stated that the bag "Contreras" was carrying "looked like almost the same bag that was used" in the money drop two weeks prior, there was no testimony about how he was able to recognize the bag "Contreras" used at the money pickup. He described the bag as a black "two-handled shopping bag" with no distinctive markings or characteristics that would distinguish it from any other shopping bag. Also, TFO Chabot did not "personally observe anything" distinctive that would indicate the size or shape of the items inside and merely speculated that the bag might contain United States currency or narcotics because it looked "weighted." Although, he stated he could not see what was in it.

Furthermore, the vehicle that was searched was not present at the money pickup two weeks prior. TFO Chabot testified that the "only thing that was seen two weeks before was the passenger of the gray Jeep Cherokee." Thus, the sole connection linking "the place to be searched directly to the criminal activity" was a common black shopping bag, viewed from thirty to sixty feet away, that he was unable to see the contents of, and had not personally viewed before. The record is simply devoid of any information upon which this Court can reasonably find that probable cause of a crime existed when "Contreras" exited the property with a heavy shopping bag and entered the gray Jeep Grand Cherokee.

Pa.R.A.P. 1925 Opinion, 7/3/24, at 8-9.

The trial court erroneously applied a probable cause standard in the course of its analysis. *Id.* The Commonwealth as well mistakenly agreed below that probable cause was the legal standard necessary to stop Appellant's vehicle. N.T., 4/5/24, at 18. These errors, however, are not binding upon us, because we review the trial court's legal conclusions *de novo* and are not bound by its legal conclusions. *Barnes*, 296 A.3d at 55.

"In reviewing whether reasonable suspicion ... exists, we must ... examine the totality of the circumstances to determine whether there exists a particularized and objective basis for suspecting an individual [] of criminal activity." *Id.* Even innocent factors, viewed together, may arouse suspicion that criminal activity is afoot. *Id.*; *see also Commonwealth v. Riley*, 715 A.2d 1131, 1135 (Pa. Super. 1998) ("[A] combination of circumstances, none of which taken alone would justify a stop, may be sufficient to achieve a reasonable suspicion"). Moreover, "in determining whether the officer acted

reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or hunch, but to specific reasonable inferences he is entitled to draw from the facts in light of his experience." ***Terry v. Ohio***, 392 U.S. 1, 27 (1968).

In this case, Appellee's attorney conceded that TFO Chabot, the lone witness during the suppression hearing, was "as credible as can be." N.T., 4/5/24, at 20. The trial court did not express any reservations about TFO Chabot's credibility in its opinion. TFO Chabot had 28 years of experience as a police officer, including five years in the DEA. ***Id.*** at 5. On the date of the traffic stop, TFO Chabot was a DEA officer involved in a multi-year investigation into a large-scale drug trafficking and money laundering organization. ***Id.*** at 6. Prior to the stop, TFO Chabot had been involved in "between 40 and 75, maybe 80, different money picks or money rips" during his time as a narcotics investigator." ***Id.*** at 15. TFO Chabot knew that Contreras had delivered at least $175,000.00 in cash for the drug trafficking organization just two weeks earlier. Based on that knowledge, TFO Chabot had reason to believe that Contreras was working for the drug trafficking organization and that his responsibilities included acting as a courier for substantial sums of money. Contreras returned to the 9th Street residence after completing this delivery. Thereafter, members of the DEA began surveilling the 9th Street residence. On March 9, 2023, the day of the car stop, TFO Chabot saw Contreras and Appellee emerge from the 9th Street

residence. Contreras was carrying a two-handled bag that TFO Chabot thought was "weighted" based on Contreras's posture. *Id.* TFO Chabot recognized the type of bag as one of the three most common containers used by the trafficking organization to transport drugs and cash. *Id.* Contreras placed the bag in a gray Jeep Grand Cherokee, and Appellee and Contreras drove away in the Cherokee.

Viewed in its totality, this evidence was sufficient to provide reasonable suspicion that Appellee was engaging in drug-related criminal activity. We note that Pennsylvania courts often find probable cause, a higher standard than reasonable suspicion, when a trained narcotics officer sees a defendant use an otherwise lawful container that the officer knows to be associated with the drug trade. *See Commonwealth v. Burnside*, 625 A.2d 678, 681 (Pa. Super. 1993) ("while a particular type of container may have lawful purposes, the circumstances under which a trained narcotics detective views its use may be tantamount to a view of the actual contraband"); *see also Commonwealth v. Evans*, 661 A.2d 881, 889 (Pa. Super. 1995) (relying on officer's training and experience that "a brick-shaped object covered in plastic" was likely to contain narcotics); *Commonwealth v. Mallory*, 614 A.2d 1174, 1179 (Pa. Super. 1992) (finding that "veteran officer" had probable cause to believe "plastic bag" contained drugs, based in part on the officer's extensive experience with drug offenders using those bags to store narcotics).

In this case, the evidence provided reasonable suspicion to stop the Cherokee in which Appellee was driving based on TFO Chabot's 28 years of experience, including several years investigating the particular large-scale drug trafficking and money laundering organization in which he knew Contreras to be involved, combined with the officer's observations of (1) Contreras and Appellee exiting the residence that Contreras visited after a prior money drop; (2) Contreras carrying a weighted container that the officer knew the organization used to transport drugs and cash; (3) Contreras placing the container in a grey Jeep Grand Cherokee; and (4) Appellee and Contreras driving away in the Cherokee.

For these reasons, we vacate the order granting suppression and remand for further proceedings.

Order vacated. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/30/2025